## MINNIE MAUD RESERVOIR & IRRIGATION CO. v. GRAMES.

### No. 1592 (81 Pac. 813).

WATER COURSES—APPROPRIATION—USE—ACTIONS—DECREE.— Where defendant had lived on certain land since 1890, and since 1891, and before the formation of plaintiff corporation, had appropriated the waters of a creek to irrigate between 40 and 50 acres thereof through a ditch four feet wide and a foot and a half deep, it was not error, in a suit by the corporation to establish the rights to the waters of the creek, for the court to award defendant, as a prior appropriator, one-half of one cubic foot of water per second during the low-water and three-fourths of a cubic foot per second in the highwater season, it having been stipulated that "the duty of water for the land in controversy is one cubic foot for 65 acres of land."

STRAUP, J., dissenting.

(Decided July 28, 1905.)

APPEAL from District Court, Carbon County; Jacob Johnson, Judge.

Action by the Minnie Maud Reservoir & Irrigation Company against Martha Grames. From a decree establishing irrigation rights in the waters of a certain creek, plaintiff appeals.

AFFIRMED.

*L. O. Hoffman, S. R. Thurman* and *Hurd & Wedgwood* for appellant.

*W. H. Frye for* respondent.

BARTCH, C. J.

The plaintiff brought this action to determine and quiet its right to the waters of Minnie Maud creek, a stream in Carbon county, Utah, and to enjoin the defendant from interfer-

29 Utah—15

ing with, or from diverting or using, or asserting any right to the use of, the water of the stream. The defendant, in her answer, after alleging her right to the use of a certain quantity of the water from the stream by appropriation and adverse user, prayed that she be awarded the right to use a sufficient amount to irrigate 160 acres of land and for domestic and other purposes. At the trial the court, after hearing the evidence found in favor of the defendant, awarded her a certain portion of the water of the stream, and enjoined both parties from interfering with the rights to the use of water as estabished by the decree.

This appeal is from the judgment and decree. The appellant contends that two of the findings of fact are not supported by the evidence, and that the decree, being based on the findings of fact, is erroneous. The objectionable findings read as follows:    "The defendant has, by adverse user of the waters of the Minnie Maud creek, acquired a right to the use of a certain quantity of the waters of said Minnie Maud creek, and that such user has been for more than seven years last past; that the preponderance of the evidence shows that defendant is entitled to a certain quantity of the waters of said Minnie Maud creek by reason of defendant's said adverse user of said waters." "That the quantity of water acquired by such adverse user amounts to one-half of one second foot of water until the flow of the same, at the point of diversion, by the defendant, amounts to three second feet, and after adding the one-half second foot to said flow, defendant is entitled to one-fourth of a second foot in addition to the one-half second foot aforesaid." The decree based upon these findings, so far as material here, provides that the defendant "shall have and be entitled to the undisputed use and enjoyment of a one-half of one second foot of water" from the stream at the point of diversion by her, for agricultural and other beneficial uses, "at all seasons of the year, and at all times, for use on her lands on said Minnie Maud creek, until the flow of the waters" of the creek "shall reach a quantity equal to three second feet, and, after adding said one-half of one second foot to such flow, the defendant shall

have and be entitled to the use and enjoyment of one-fourth of a second foot of the water of Minnie Maud creek, in addition to the one-half of one second foot as aforesaid at the point of diversion." This decree, it seems, gives the defendant one-half of a second foot during the time of low water and three-fourths of a second-foot during the high-water season when the flow of the stream amounts to three second feet; and from a careful examination of the evidence we are unable to say that the proof does not sustain the above findings upon which the decree is founded. Even if, considered in a purely technical sense, the evidence were conceded to be insufficient to sustain an adverse user, still the proof disclosed by the record is ample to show that the defendant is entitled, because of prior appropriation and use, at least to the amount of water awarded her. On the question of her diversion and use of the water, E. C. Lee, one who, with others, deeded his water rights to the plaintiff corporation and is one of the principal witnesses of the plaintiff, testified: "She has used the water every year since 1892 to the present year. She turned it out of the ditch, and irrigated what land is cultivated. She put a dam in the creek, and has done so every year since 1892. Up to the time of the commencement of this action, these dams were never taken out, that I know of. She used the water as she saw fit, for anything that I know of, and I only got what water she did not use." The witness made further statements as follows: "I asked the defendant to turn the water down in 1900. I was there once before, but I do not know when it was, and I saw her turn the water down. I did nothing but ask her to turn it down. She has gone along using the water from the first time I knew of her having water out of the creek until the present time each year. I never took out any of her dams, or turned the water, or attempted to. When I went up to see Mrs. Grames in 1900, I told her I was burning up down there for want of water. I told her I would like to have her turn it down for ten days. I thought I could save my crops. She said would turn it down for me. I remember going up there and seeing about getting some water a good many years ago. We were short

of water, but I cannot remember the conversation. Mr. Grames first commenced to irrigate in 1892. Before he commenced to irrigate there was about 120 acres irrigated. [By plaintiff's grantors.] The lands in the canyon are sandy, and soak freely, and require a large quantity of water to irrigate them. I have been at Mrs. Grames' place every year. I saw water running in the ditch in 1892. I did not see it go to the land. I have seen water running on the land in different years up there. The first time I saw the Grameses there they had just started digging into the bank to put up the house. That was in 1891." The witness D. C. Johnson, testifying for the plaintiff, and referring to the husband of the defendant, said he saw him "on the land that Mrs. Grames now occupies in 1891, either the latter part of July or the first part of August." J. A. Hamilton, another witness for the plaintiff, testified; "I went to the Minnie Maud country in 1894. I am familiar with the land under irrigation in 1895. Two years ago I measured the land under cultivation when I went there, and found something over 300 acres. I measured the plaintiff's land and found thirty-three acres and a fraction of land that had been plowed and irrigated. When I went there in 1894, Mr. Lee's place and the Johnson place and Campbell place and Mrs. Grames' place were all that were under cultivation and irrigation, that I remember of. I should judge that Mrs. Grames has increased her land under cultivation since 1894 fifteen acres —something near that." The defendant, in her own behalf, testified: "I reside on Minnie Maud, in Carbon county, Utah. I have lived there since 1890. Our permanent home has been there since 1890. My husband lived with me until his death, six years ago last August. We located there the 26th day of August, 1890, and have resided there continually since. In 1891 we took out a large ditch, four and one-half feet wide on the top and two feet deep, and took the water from the creek through this ditch. The ditch was built to take all the water of the creek onto my land. The first year after taking out the ditch, we cultivated ten or twelve acres. That was in 1891. We had water on our place in

May, 1891. I should judge we have something near forty or fifty acres, altogether, which we irrigate now. We have used the water on that place every year when there was water in the creek to put on it. No person below claiming the water has interfered with my use. The year before the incorporation I turned the water down at Mr. Lee's request." The witness A. J. Russell, testifying for the defendant, said: "I should judge that the Grames ditch was four wide and a foot and a half deep. It was taken out in the spring of 1891. I don't know what time." The witness Hall said: "Mrs. Grames went to Minnie Maud creek in the fall of 1890, and put up a rock house. In the spring of 1891 they built a ditch from the creek. I should judge it was somewhere in the neighborhood of four feet wide and two feet deep. In 1892 they had a nice little crop in; in my judgment, from twelve to fifteen acres; principally oats, meadow, and some potatoes." There is other evidence of similar import in the record, but further quotation therefrom or further reference in detail thereto is not deemed necessary. It is clear that the defendant is entitled to all the water awarded her by the decree. Especially is this true in view of the fact that by express stipulation of the attorneys for the respective parties "the duty of water for the land in controversy is one cubic foot per second for sixty-five acres of land." It is shown that she has forty to forty-five or fifty acres of land under cultivation, and has been allotted but one-half in low and three-fourths cubic foot per second in high water season. It is also shown by the testimony of the witnesses on both sides that the defendant's appropriation of water was first made in 1891; that the respondent has used the water upon her land ever since; and that, while occasionally she turned it down for use by those below her upon the stream, at their request, her right to its use, previous to the organization of the plaintiff company and the time when this controversy arose, appears to have been admitted or acquiesced in by those who would have been most interested in contesting such right. That the water thus appropriated and used by the respondent and her husband was subject to such appropriation and

use, is shown by the appellant's own evidence, from which it appears that before Mr. Grames commenced to irrigate there were but about 120 acres irrigated, while in 1894, after the water in dispute had been appropriated, the appropriation having been made in 1891 and 1892, there were over 300 acres under cultivation. From this it is apparent that, even after the water of the respondent had been appropriated, there must have remained a considerable flow yet unappropriated.

Under the facts and circumstances disclosed by the evidence in the record, we are not disposed to disturb the decision of the lower court, the decree being manifestly warranted by the proof.

The judgment is affirmed, with costs.

McCARTY, J., concurs.

STRAUP, J. (dissenting).

I dissent. The situation, in brief, is this: The grantors of plaintiff, in 1890, located on land along the lower portion of the stream, and appropriated from it all the low water, with which they irrigated and had under cultivation about 120 acres of land. The evidence shows without dispute that the stream in low-water seasons generally would irrigate not to exceed one-hundred acres, and that during the low-water seasons all the water of the stream was taken out by them in 1890 and 1891, and by means of ditches was conveyed upon their lands. At the commencement of the irrigation seasons, and at the time of the melting of snow, there generally was plenty of water for everybody, and in the spring was sufficient to irrigate about three-hundred acres. But for the two years prior to the commencement of the action there was water only sufficient to irrigate one-hundred acres. The flow of the stream is very erratic, depending upon the prevailing weather conditions previous to the irrigation season. In 1890 the defendant and her husband settled on lands along the upper portion of the stream, but took no water from it until 1891,

and in that year, as testified to by the defendant herself, took sufficient water to irrigate six acres. In 1892 they cleared about fifteen acres, in 1893 about ten acres, in 1894 three acres, and in 1895 five or six acres, or about forty acres in all. The manner in which the defendant used the water characterizing it as not an adverse user against plaintiff's grantors is best shown by the testimony of the defendant herself: "I knew there were some people down on the creek below that took out water before I did. I never intended to deprive them of water. I never turned off any water with that intent. At the time I went there, as far as my knowledge goes, there was water enough in the stream to irrigate the lands below me that were under cultivation. I would not say that there was not water enough in the stream to irrigate these lands in 1894, in 1897, and in 1898. I went there to make a home, and intended to bring land under cultivation. I knew that Mr. Johnson was down below making a home the same way that I was, and that he was there one year before me. I knew that Mr. Lee was down there making a home; that he was there when I came there, and that he had the same intentions as I; and that Mr. Campbell was there making a home; and that Mr. Hall and Mr. Russell were there making homes, the same as I was. I had no reason to believe that their intentions in regard to making a substantial home were different from mine." All these persons were grantors of the plaintiff Mr. Lee, the largest owner, and who had something over eighty acres under cultivation and irrigated from this stream prior to the defendant taking any water at all, also testified: "During the past thirteen years since I settled there, several years I have had plenty of water to raise crops upon my land. I had plenty in 1894, and plenty in 1897 and 1898, and other years besides. When I first went there, there was plenty of water, but some years since it has been dry. At no time since I have been there was there seven years continuously when I did not have water enough to raise my crops." The record also shows that while the defendant increased her acreage from six acres in 1891 to about forty acres in 1895, the grantors of the plaintiff during the same

time increased their acreage from 120 acres to something like 200 or 300 acres. This case is but one of many where during favorable winters, due to large quantities of snow falling, and other favorable climatic conditions, there is plenty of water for everybody; but where, owing to dry seasons and lack of snowfall, the quantity of the stream is greatly diminished, resulting in a scarcity of water for all; and where so-called "subsequent appropriators," higher up the stream, infringe upon the rights of the first or prior appropriators below, and the trouble begins. Now, while it appears that the defendant every year from 1891 to the time of the filing of the complaint used water from the stream upon her land, the evidence is wanting that she took water which, by priority, belonged to the grantors of the plaintiff, and that such kind of taking and using was for a period of seven years, and was adverse to them. It is also true that at times she did take water which by priority belonged to the said grantors, yet the evidence is wholly wanting that such a taking was continuous, uninterrupted, and for a period of seven years, and was hostile and adverse to them. To the contrary, the evidence shows that when the rights of the said grantors in low-water seasons were infringed upon by the taking of their water, and when upon their request and demand that she turn it down the stream, she did so. To constitute an adverse user of water, it is not sufficient merely to show that one used water from the stream, but it must be shown that the water which by priority belonged to another appropriator was taken and used under claim of right or title, and that the taker or user was in the peaceable, open, continuous, and uninterrupted possession thereof under such claim for a period of seven years. The law applicable to the adverse user of water is well stated in the following case:

"When there is sufficient water in the river to supply all parties, there can be no such thing as adverse use of the water to start the statute of limitations running. Each is entitled to the use of the water, and it is only when the water becomes so scarce that all of the parties cannot be supplied,

and that one appropriator takes water which by priority belongs to another appropriator, that there is an adverse use. The statute commences to run from the time when such adverse use is made of the water, the adverse use being only of that water which the prior party is entitled to. When there is a sufficiency of water in the river, the prior appropriator is not entitled to the water used by the subsequent appropriator, and the subsequent appropriator can use under his appropriation without being an adverse user." (*Egan et al. v. Estrada* (Ariz.), 56 Pasc. 721; *Anaheim Water Co. v. Semitropic Water Co.* (Cal.), 30 Pac. 623; *American Co. v. Bradford,* 27 Cal. 361; *Land & Water Co. v. Hancock* (Cal.), 24 Pac. 645, 20 Am. St. Rep. 217; *Faulkner v. Rondoni* (Cal.), 37 Pac. 883; *Church v. Stillwell* (Colo. App.), 54 Pac. 395; 3 Farnham, Water and Water Rights, p. 2106.)

The evidence fails to show such a use of the water on the part of the defendant. If anything, it shows the contrary. When, therefore, the court found that the defendant, by an adverse use, acquired the right to the use of a certain quantity of the waters of the stream, it lacks support from the evidence.

Nor can I agree to an affirmance of the judgment on the theory that the defendant appropriated the water awarded to her by the decree. The court below found that the defendant's right to the water was acquired by an adverse use, and not otherwise. No finding at all was made as to any appropriation of water by the defendant, or as to any right acquired by her from an appropriation. The judgment rests alone upon the finding of an adverse user. However, on the theory of an appropriation by her, the evidence most clearly shows that she did not make any appropriation of the waters of the stream in low-water season . For the evidence, without dispute, shows that generally in low-water seasons the stream was sufficient to irrigate only one hun-

dred acres, and that in 1890 and 1891, before the defendant took any water at all from the stream, the low-water had all been appropriated by the grantors of plaintiff, and was all taken from the stream, and conveyed by means of ditches upon their lands, with which about 120 acres was and had been irrigated by them. It is plain what water was appropriated from the stream by the defendant was surplus water, and that the taking was subordinate to the prior appropriation and acquired rights of the said grantors. Nevertheless the court finds and decrees that the defendant, at the point of diversion by her, which is the highest point up the stream, shall have "at all seasons of the year and at all times" the quantity of water found and awarded to her by the findings and decree, which is estimated to be sufficient to irrigate about forty acres of land; while the plaintiff, whose grantors were first in time, and should be first in law, is found to have and is decreed "the remainder of the waters of said creek at said point of diversion," regardless as to whether there be sufficient or any water at all remaining with which to irrigate the said 120 acres of land, or any part thereof. In other words, by this decree the first appropriator shall be last, and the last appropriator shall be first. The court does not find, nor does the evidence disclose, the volume of the stream, except as the witnesses say that in low-water seasons it is only sufficient to irrigate one hundred acres. This award, too, as made, is sufficient to irrigate all defendant's land notwithstanding that she increased her acreage from six acres in 1891 to forty acres in 1895, while the grantors of plaintiff during the same time were increasing their acreage from 120 acres to 200 or 300 acres.

I think this judgment is wrong, and ought to be reversed, and the case remanded for new trial.